UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

OLD WEST ANNUITY AND LIFE
INSURANCE COMPANY,

                    Plaintiff,

UNITED STATES OF AMERICA,

                    Intervenor-plaintiff,


-vs-
                                                    Case No.  5:03-cv-354-Oc-10GRJ


THE APOLLO GROUP, a California
Corporation,

                    Defendant.

_____

### MEMORANDUM OPINION

This case concerns a dispute over the disposition of funds deposited in the Court's

registry following a Court-approved sale of certain real property located in Clermont,

Florida.  The property was formerly owned by the Defendant, the Apollo Group, Inc.,

("Apollo"), a debtor of Plaintiff Old West Annuity and Life Insurance Company, ("Old West"),

and Intervenor-Plaintiffs United States of America, Camp Coast to Coast, Inc., and Affinity

Group, Inc.[1]  The Court-approved sale generated net proceeds of $4,406,387.61, and on

February 28, 2005, the Court directed that the amount of $2,886,261.10 plus interest, be

_____

[1]Camp Coast to Coast and Affinity Group are affiliated companies and will be referred to
collectively as "Coast."

distributed to Old West in full satisfaction of its superior mortgage interest in the Clermont property.  (Doc. 97).

A balance of just over $1.5 million remains in the Court's registry.  The United States contends that it is entitled to the entire fund to satisfy a tax lien for Apollo's unpaid taxes of approximately $25,000 plus other unpaid tax assessments in excess of $10 million against Apollo,'s alleged alter ego, All Seasons Resorts, Inc. ("All Seasons").

Coast claims an interest in the fund based on a judgment lien on the Clermont property from prior litigation against Apollo in Orange County, California.

The Parties agree that the United States' direct tax claims against Apollo take priority over Coast's judgment lien and should be paid first from the remaining proceeds.  There is also no dispute over the validity of the tax liens against All Seasons.

Following an extensive discovery and motions process, the task of distributing the remaining fund has been distilled to two outstanding issues:  (1) whether Apollo was the alter ego of All Seasons, and can be held liable for All Seasons' tax liabilities; and (2) whether Apollo's acquisition of the Clermont property from All Seasons in October 1997 constituted a fraudulent transfer under Florida law such that the United States can have the transfer avoided.  A non-jury trial was held on these remaining issues, during which the Parties submitted numerous exhibits and the deposition excerpts of one witness, Raymond G. Novelli.  At the conclusion of the trial, the Parties were provided the opportunity to submit proposed findings of fact and conclusions of law, (Docs. 168-69), and the matter is now ripe for resolution.

2

## **FINDINGS OF FACT**

At the non-jury trial, the following was established by a preponderance of the testimony and documentary evidence offered and admitted into evidence.

I.      The Corporate Entities

All Seasons was a Washington state corporation that owned and managed numerous private membership campgrounds.  On June 7, 1984, All Seasons acquired the Clermont property which All Seasons then operated as a private campground.  Raymond Novelli became the President of All Seasons in May, 1986 and remained its President through its liquidation in 1997.  Novelli's wife, Marlies Novelli, was All Seasons' Secretary.  Mr. Novelli owned 75 percent of All Seasons' voting stock, and the other 25 percent was owned by the Schulz Family Trust.[2]  Raymond Novelli's brother-in-law, Hans Schulz, was the trustee and creator of the Schulz Family Trust.

Since 1986, All Seasons has failed to pay its federal employment taxes and unemployment taxes, and now owes to the United States approximately $10,779,556.47 plus interest and penalties.  The United States, through the Internal Revenue Service, has made tax assessments against All Seasons for these unpaid taxes, and obtained federal tax liens - the same liens which the United States seeks to enforce in this case.

---

[2]The Trust owned a number of assets, including stock of several corporations, a jet airplane, a home that Ray Novelli lived in for 10 years, and a Delta Isle campground located near Sacramento, California, which was later transferred to a subsidiary of The Apollo Group, Delta Isle Resort and Marina Club.

Apollo was incorporated in California on May 29, 1995 for the general purpose of investing in resort properties.  Since the time of its formation, and throughout its existence, Raymond Novelli was one of Apollo's principals and, at various times, there were up to 10 other shareholders.  Apollo never had its own employees, but did have its own bank account, and for approximately ten years it shared the same business address as All Seasons.  Apollo did not pay its federal employment and unemployment taxes for the tax year 1997 and as of December 7, 2006, owes the IRS approximately $25,000.  At the time Apollo filed for bankruptcy in 2001, Novelli was the company President/Director and owner of 25 percent of the voting stock, Hans Schulz was the Vice President/Director and owner of 51 percent of the voting stock, and Marlies Novelli was the Secretary/Director and owner of the remaining 24 percent of the voting stock.

II.    The 1986 Note and Mortgage

Apollo is the general partner of The Apollo Group, Ltd., a California limited partnership ("Apollo, Ltd.").[3]   On April 23, 1986, Apollo, Ltd. loaned All Seasons $1,000,000, for which The Apollo Group received a promissory note and a mortgage on the Clermont property.  The note was signed by Leonard Gross, then-President of All Seasons.  The terms of the note required that All Seasons make quarterly payments at 12 percent interest.  The mortgage was a subordinate mortgage, and at the time of its execution, there

---

[3]Where no distinction is made between The Apollo Group, Inc., and The Apollo Group, Ltd., they will be referred to collectively as Apollo.

4

purported to be sufficient equity in the Clermont property to secure the loan.  The United States has not submitted any evidence to the contrary.

On December 29, 1986, the Mortgage and Security Agreement was filed of record in Lake County, Florida.  Although Novelli did not sign the promissory note, he did sign the Mortgage and Security Agreement in his role as President of All Seasons.[4]  The Agreement was notarized by Novelli's wife, Marlies Novelli, and witnessed by Hans Schulz, Marlies' brother.  Novelli testified at his deposition that All Seasons made a few payments on the Mortgage and note, but not many.

III.   All Seasons' Bankruptcy Proceedings

Between 1986 and 1997, All Seasons filed for bankruptcy three times, all in the Central District of California.  The first two bankruptcy proceedings were filed under Chapter 11 of the Bankruptcy Code (in 1987 and 1990), and a plan of reorganization was confirmed.  Each plan included payment to Apollo, Ltd. for All Seasons' debt.[5]  Between

---

[4]It is unclear from the record to what extent the presidencies of Mr. Novelli and Mr. Gross overlapped.

[5]The United States contends that Apollo, Ltd.'s note was not included in the plans of reorganization from these first two bankruptcies, and therefore, by implication, the note ceased to exist and was not a valid debt at the time of the third and final bankruptcy proceeding.  The only evidence proffered by the United States on this point consists of a request that the Court take judicial notice of the website for the United States Bankruptcy Court in the Central District of California, and the electronic pages on that website for the claims registers for All Seasons' first two bankruptcy proceedings.  According to the United States, these claims registers do not include a claim by Apollo, Ltd. on its note.  However, the Court cannot accept the United States' contention that these websites conclusively demonstrate that Apollo Ltd.'s claims were never filed such that judicial notice should be taken of that asserted fact.  The United States has not provided evidence explaining the nature of the electronic claims register, what information is typically (continued...)

one and three payments were made to Apollo, Ltd. after each bankruptcy proceeding, but the debt was never satisfied.  At some point, Apollo, Ltd.'s limited partners filed suit against All Seasons for collection on the note, but the suit was eventually dismissed.

On June 7, 1996, Finova Capital Corporation, a mortgagee of All Seasons, filed suit against All Seasons in the United States District Court for the District of Arizona, alleging that All Seasons had defaulted on secured obligations.  All Seasons was placed into receivership on August 29, 1996.  On July 11, 1997, All Seasons filed its filed its third and final bankruptcy in the Central District of California.

During the bankruptcy proceedings, an entity known as "The Apollo Group" was listed as an unsecured creditor in the amount of $302,415.  The United States, through the Internal Revenue Service, also filed a claim for tax assessments against All Seasons - the same tax assessments the United States now seeks to recover in this case.

A bankruptcy trustee was appointed to operate All Seasons' business on August 4, 1997.  Following an investigation into All Seasons' assets and creditors, the Trustee determined that All Seasons' business could not continue to operate, that reorganization

---

[5](...continued)
included in the registers, whether all claims must be listed on the register or can simply be included in the original petition schedules, or even whether the court's website is complete.  In addition, neither party has submitted the Plans of Reorganization themselves, which should provide the most conclusive information.  Instead, the Court is left with the undisputed deposition testimony of Raymond Novelli who testified that Apollo, Ltd.'s claims on the note were part of each bankruptcy's reorganization plan, that the claims survived each bankruptcy, and that some payments were made on the note after each bankruptcy.  The Court will therefore rely on Mr. Novelli's testimony - which was submitted by the United States itself - and finds that Apollo, Ltd.'s note on the Clermont property was part of each Plan of Reorganization.

was not feasible, and that liquidation was appropriate.   The Trustee terminated All Season's business on September 29, 1997, and began preparing for the sale of its assets.

Pursuant to the Trustee's Final Report, the Trustee determined what assets should be sold by: (1) reviewing the receivers' appraisals and financial reports from August 29, 1996 to July 31, 1997; (2) reviewing an informal title report dated January 15,1997 and an updated report dated October 3, 1997; (3) reviewing the pre-petition and post-petition liabilities from the operation of All Season's business; (4) obtaining the computer disks and written copy of the 18,000 membership list from the receiver; (5) obtaining a UCC search dated October 10,1997 for each state where All Seasons did business; and (6) communicating with the parties in interest.   The Trustee then marketed All Seasons' assets, including the Clermont property, for auction, which was scheduled for October 27, 1997.

The Trustee held the public auction on October 27, 1997 as scheduled.   That day, Apollo, Ltd. filed a secured claim in the bankruptcy proceedings in the amount of $2,127,820.   Mr. Novelli was not directly involved in the decision to file the secured claim, but he was aware of it, and he did participate in at least one meeting of the partnership of Apollo, Ltd. during which the possibility of acquiring some or all of the campgrounds was discussed.

The secured claim listed Apollo, Ltd.'s current address as 17672-B Cowan Avenue, Irvine, California, the same address that All Seasons listed on its bankruptcy petition, and

was signed by Phillip Martinez as president of Apollo, Ltd.[6]  At the auction, Apollo, Ltd.

successfully bid on the Clermont property.  The IRS was present at the auction, as well as

other creditors of All Seasons.  There is no evidence that anyone - including the IRS -

challenged the validity of Apollo Ltd.'s secured claim, or its right to bid on the property,

either before or after the sale.[7]  As part of the sale, the Trustee also sold to Apollo, Ltd. the

membership list for the Clermont property's campground.

At the conclusion of the auction the bankruptcy court conducted a hearing on the

sale of assets, at which time the court heard from the Trustee, secured creditors, and credit

bidders.  No one raised any objections to Apollo, Ltd.'s purchase of the Clermont property,

and the purchase was confirmed by the bankruptcy court by order dated November 4,

1997.  The order recites that the Clermont property, along with the list of members for the

campground located on that property, was sold and transferred to "The Apollo Group, Ltd.,

by its General Partner Apollo Group, Inc., a California limited partnership," for the amount

---

[6]Phillip Martinez and Mr. Novelli had met in the early 1980's when they were both incarcerated in a California prison.  Mr. Novelli hired Mr. Martinez in 1995 when he was released from prison, and Mr. Martinez worked for Ray Novelli for three or four years.  Based on this prior history, the United States suggests that at all times Phillip Martinez was acting at the direction of Ray Novelli, and that Mr. Novelli in fact controlled the operations of Apollo, Ltd.  Other than the United States' speculation, there is no evidence to support this conclusion.

[7]Coast points to the deposition excerpts from Ray Novelli, in which he states that the IRS was involved in All Seasons' operations and bankruptcy proceedings from February 1987 through its liquidation, and that the IRS should have been very much aware of the fact that at least some of the owners and officers of Apollo were the same as those of All Seasons.  Mr. Novelli further testified that the IRS had copies of Apollo, Ltd.'s note and mortgage with All Seasons, was aware of Apollo, Ltd.'s lien against the Clermont Property, and had a copy of the Bankruptcy Trustee's Deed.

of $1,700,000, to be offset against the Apollo Group's secured claim.  The order further

recited that Apollo would take title

> subject only to: A) any and all claims or liens of Lake County, including but not
> limited to property taxes and related property tax claims or liens, and, B) all
> other valid and perfected liens, if any, which are senior to the lien held by the
> Apollo Group.  Except as specifically provided herein, the Apollo Group shall
> take title free and clear of all junior liens, claims, encumbrances, or interests.

According to the bankruptcy court order, All Seasons was represented by its attorney T.

Edward Malports, and Terry Moshenko, who had previously held the position of All

Seasons' receiver in the Arizona proceedings, appeared on behalf of The Apollo Group at

the hearing confirming the bankruptcy auction.[8]

On January 23, 1998, the Trustee executed a Bankruptcy Trustee's Deed conveying

the Clermont property to "The Apollo Group, general partner of the Apollo Group, Ltd." free

---

[8]According to the order, eight other campground properties and their accompanying membership lists were sold to either Apollo or to Hans Schulz as credits against other secured claims.  A Grass Lake, Michigan campground was sold directly to Apollo, and properties in Elkhorn, Wisconsin and Mercer, Pennsylvania were sold and transferred to Hans Schulz in trust for a Barclays American/Business Credit, Inc. secured claim.  The order further recited that a campground in Dowagiac, Michigan was sold and transferred to Hans Schulz in trust for the Security Capital Credit Corporation as an offset on its secured claim.  Soon after this order was entered, Schulz transferred the Wisconsin, Pennsylvania and Dowagiac, Michigan properties to Apollo.

Ray Novelli testified that these secured claims involved promissory notes that had previously been issued to All Seasons, with the various campgrounds as collateral.  However, Mr. Novelli has never been able to produce copies of the promissory notes, and he admitted at his deposition that no payments had ever been made on the notes, and that no deeds of trust had ever been executed to secure the notes.  On the other hand, the United States - which has the burden of proof in this case - has not presented any evidence to rebut Mr. Novelli's testimony or to establish that these promissory notes were invalid.  Given that the only admissible evidence on this point is again the undisputed testimony from Mr. Novelli, the Court concludes that the promissory notes did, in fact, exist.

and clear of all other liens.[9]   The deed was not recorded in Lake County, Florida until November 18,1999 .  It is unclear exactly why the property was conveyed to the corporate general partner as opposed to the limited partnership itself.

The Trustee submitted his final report on August 4, 1998 recommending that All Season's bankruptcy case be dismissed because there was no likelihood of reorganization. The bankruptcy court approved the final report and dismissed the case on August 5, 1998. At that time All Seasons had been fully liquidated and ceased to exist.

On  December 24, 1999, Apollo executed a "Quit Claim Deed to Correct Error" in order to address any title concern that may have arisen from the language of the Bankruptcy Trustee's Deed with respect to the Clermont property.  The Quit Clam Deed, which was signed by Hans Schulz as President of Apollo, clarified that the intent of the parties at the time of the October 1997 bankruptcy sale was to convey the Clermont property directly to Apollo in its role as the general partner of Apollo, Ltd., and not to provide Apollo, Ltd. with any ownership to the property.  The Quit Claim Deed was filed and recorded with the Lake County Clerk of Circuit Court on December 29, 1999, along with a "Partnership Affidavit" listing the partners of The Apollo Group as Apollo, Ray Novelli, Hans Schulz, Mel Tari, Curtis Bain, and Marlies Novelli.  The Quit Claim Deed listed the business addresses for both Apollo and Apollo, Ltd. as the same Irvine, California location.

---

[9]While the Deed is dated October 27, 1997, it was not notarized until January 23, 1998.

IV.   Post-Bankruptcy Events

On March 16, 1998, Apollo filed a bankruptcy petition with the United States Bankruptcy Court for the Eastern District of Michigan.  The petition was signed by Phillip Martinez as Apollo, Inc.'s president and Ray Novelli testified that he participated in the decision to file for bankruptcy.  The petition listed Apollo, Inc.'s address as the same Irvine California address used by All Seasons at the time of its bankruptcy proceedings and by Apollo, Ltd. on its secured claim in All Seasons' bankruptcy.

Apollo, Inc.'s bankruptcy petition stated that it was the owner of the Clermont property, as well as the four other campgrounds Schulz transferred to The Apollo Group in 1997.  The Michigan bankruptcy proceeding was dismissed on March 31, 2000 as having been filed in bad faith.  Apollo, Inc.'s disclosure statement noted that Apollo had previously entered into lease agreements with Travel America, Inc., a California corporation and successor to All Seasons, and that Travel America would operate the campgrounds.

Ray Novelli was the president of Travel America, Hans Schulz ran the company's computer systems and billing systems, and Marlies Novelli assisted with campground operations.   All five campgrounds used the same computer system and the same collections department.  Each campground was charged a pro rata share of common expenses like office rent and telephones, and all of the monies received from the campgrounds (such as membership dues) were pooled into a single sweep account.  Money would be taken from the sweep account to pay each campground's bills.  With respect to the Clermont property itself, the campground continued to operate under the

11

same rules previously established by All Seasons, and All Seasons' members were permitted to use the property under the same terms after Apollo acquired the property. There is no evidence that Apollo was a general or limited partner of Travel America, or that there was any common ownership.

Mr. Novelli has continued to use the name "All Seasons" in several successor companies.  On November 24, 1999, more than two years after Apollo acquired the Clermont property at the bankruptcy auction and more than one year after All Seasons' dissolution, Apollo created Orlando All Seasons Resort, Inc. ("Orlando All Seasons"), in order to operate the Clermont property.   Orlando All Seasons conducted its initial organizational meeting on January 17, 2000.  On October 25, 2000, Delaware All Seasons Resorts, Inc., ("Delaware All Seasons") was created to be a conduit to manage properties as part of a reorganization plan to be proffered in an anticipated Apollo bankruptcy. Although these entities bear similar names to the now defunct All Seasons, Mr. Novelli testified at his deposition that the entities are separate and distinct - both from each other and from the dissolved All Seasons - and that he took the similar names because they were available and because he thought they would be recognizable to prospective customers.[10]

---

[10]Novelli has continued to run a website with the name "allseasonsresorts.com" since 2001, and has continued to distribute membership cards to campground members with the name "All Seasons Resorts" on them.

V.      The Old West Foreclosure Proceedings

On January 28, 1998, before Apollo filed for bankruptcy, Apollo, along with Travel America, Hans Schulz as Trustee for the Schulz Family Trust, and twelve other corporate plaintiffs filed suit against Coast and other entities and individuals in Orange County, California, Superior Court.  Plaintiffs' counsel was Terry Moshenko, the prior receiver for All Seasons' Arizona receivership and the representative of Apollo in the October 1997 bankruptcy auction.  The Orange County complaint alleged that these plaintiffs owned and operated membership recreational vehicle resorts throughout the United States and that they had entered into a series of contract with Coast, which had been breached.

On June 7, 2000, Apollo gave a promissory note and mortgage on the Clermont property to Old West.  Both the note and the mortgage were signed by Hans Schulz as Apollo's president.  Ray Novelli was involved in the negotiations for the loan and gave final approval for its execution.  The documents listed Apollo's address as the same Irvine California address previously used by All Seasons, and now used by Travel America.

On February 11, 2001, Old West filed suit in California state court to foreclose its mortgage on the Clermont property.  On February 14, 2001, judgment for attorney's fees was entered in the Orange County, California case in favor of Coast and the other defendants and against Apollo and the other plaintiffs in the amount of $3,880,038.54.  On April 23, 2001, Apollo filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Ohio.  The bankruptcy petition listed Ray Novelli as president, director and 25 percent stockholder in Apollo, Hans Schulz as vice-president, director, and 51

13

percent stockholder, and Marlies Novelli as secretary, director and 24 percent stockholder. As of October 28, 2004, Novelli also held the position of secretary-treasurer.  At this time, ten different campgrounds were being operated out of the Irvine, California offices, with the office lease in the name of All Seasons Resorts, Inc.

In July 2003, the automatic stay in the Ohio bankruptcy proceeding was modified to allow the foreclosure action on the Clermont property to go forward in state court in Lake County.  The United States and Coast subsequently obtained orders further modifying the stay to allow them each to intervene and attempt to collect on their liens.  The United States filed a complaint in intervention in the state court proceeding and removed the action to this Court on October 10, 2003, (Doc. 3).  A receiver was appointed for the Clermont property on March 29, 2004 (Doc. 22), and Coasts' motion to intervene was granted on September 24, 2004.  (Doc. 32).

Following a hearing on the matter, the Court issued an Order authorizing the sale of the Clermont property by the receiver and directing that the net proceeds of the sale be deposited into the Court's registry. (Doc. 59).  The Order provided that, in accordance with the stipulation of all parties, all liens would attach to the sale proceeds to the same extent and in the same priority that they attached to the property, with the United States's liens taking priority over Coast's.  The Court subsequently disbursed nearly three million dollars to Old West in satisfaction of its mortgage.  (Doc. 97).

VI.    Additional Procedural History

After Old West received its share of the sale proceeds, the United States moved to amend and supplement its complaint in intervention to include a new claim that Apollo is also the alter ego of Travel America, and to include a request that upon the Court's resolution of all claims in this case, the Court refrain from disbursing the sale proceeds and instead transmit the remaining balance to the trustee in Apollo's Ohio bankruptcy proceedings for distribution in accordance with the priority established in the Bankruptcy Code. (Doc. 107). The Court denied the United States' request to amend its complaint, but permitted amendment and argument on the bankruptcy transfer issue. (Doc. 121). On September 25, 2006, the Court denied the United States' Motion for an Order that Funds be Transferred to Custody of Chapter 7 Trustee, the United States' Motion on Behalf of Bankruptcy Estate for Transfer of Funds, and denied Coast's Cross-Motion for Summary Judgment. (Doc. 149).

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1340 and 1345, and 26 U.S.C. § 7402(a).

I.    Federal vs. Florida Alter Ego Law

The United States' first argument in favor of receiving the entire sale proceeds is that Apollo was the alter ego of All Seasons and therefore is equally liable for all of All Seasons'

federal tax obligations.[11]   There is no dispute that the United States - as the party seeking to pierce the corporate veil and establish alter ego liability - bears the burden of proof on this point.  <u>Matter of Multiponics, Inc.</u>, 622 F.2d 709 (5th Cir. 1980); <u>In re Hillsborough Holdings Corp.</u>, 166 B.R. 461, 468 (M.D. Fla. 1994).   However, before the Court can address whether Apollo is in fact All Seasons' alter ego, the Court must first determine the applicable source of the rule of decision.  The United States advocates the use of federal common law, while Coast supports the application of Florida alter ego law.

The Court's decision on this point is critical; federal common law and Florida law define alter ego liability quite differently.  The Eleventh Circuit set out the federal standard in <u>Shades Ridge Holding Co., Inc. v. United States</u>, 888 F.2d 725 (11th Cir. 1989), listing three factors to be used to determine alter ego status: (1) the control taxpayer exercises over the nominee or alter ego and its assets; (2) the use of corporate funds to pay the taxpayer's personal expenses; and (3) the family relationship, if any, between the taxpayer and the corporate officers.  <u>Id.</u> at 729.   The key issue is one of "who has 'active' or 'substantial' control".  <u>Id.</u> at 728.  <u>See also</u> <u>In re Homelands of DeLeon Srings</u>,190 B.R. 666, 669 (M.D. Fla. 1995).

In contrast, Florida courts have adopted a very stringent three-part test, which requires persuasive evidence that:  (1) the shareholder dominated and controlled the

---

[11]There is no dispute that if the Court determines that Apollo is All Seasons' alter ego, that Apollo would be liable for all of All Seasons' tax liabilities and the United States would therefore be entitled to disbursement of all remaining sale proceeds.  <u>See</u> <u>G. M. Leasing Corp. v. United States</u>, 42 U.S. 338, 351 (1977).

corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant. Hillsborough Holdings Corp. v. Celotex Corp., 166 B.R. 461, 468 (M.D. Fla. 1994). See also Homelands,190 B.R. at 670;  Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114 (1984).   Unlike federal common law which focuses solely on the relationship and level of control between entities, Florida courts "disregard the corporate entity in only the most extraordinary cases," and only where there is "proof of deliberate misuse of the corporate form - tantamount to fraud. . . ." Hillsborough Holdings, 166 B.R. at 468.  See also Hobco, Inc. v. Tallahassee Assoc., 807 F.2d 1529, 1534 (11th Cir.1987) (" '[T]he corporate veil may not be pierced [in Florida] absent a showing of improper conduct.' ") (citation omitted); Lovette v. Happy Hooker II, 2006 WL 66722, * 6 (M.D. Fla. 2006) ("[t]he Florida courts have imposed a strict standard upon those wishing to pierce the corporate veil."); Mills v. Webster, 212 B.R. 1006, 1009 (M.D. Fla. 1997) ("Those who seek to pierce the corporate veil . . . carry a very heavy burden.") (citing Hillsborough Holdings, 166 B.R. at 468).

The United States and Coast have presented a multitude of contrasting decisions from a variety of jurisdictions which  have applied either federal common law or the law of the forum state to determine alter ego liability under various federal statutory schemes.[12]

------

[12]See, e.g. United States' Post-Trial Brief at 7-11 (Doc. 168); Coast's Post-Trial (continued...)

The United States has also propounded a lengthy policy argument as to why federal

common law should apply.[13]  However, all of the decisions cited from courts within this

Circuit have applied the law of the forum state in which the court sits,[14] and more

---

[12](...continued)
Memorandum of Facts and Law at 3-7 (Doc. 169).

[13]The United States contends that federal common law should apply because the determination of alter ego status in this case implicates the rights of the United States arising under a nationwide federal program.  See United States v. Kimbell Foods, Inc., 440 U.S. 715 (1979).  In particular, the United States argues that there is a compelling need for a national uniform body of law to apply in deciding alter ego status for federal tax collection purposes so that taxpayers cannot avoid their tax liabilities by taking refuge in a state with particularly restrictive laws regarding the imposition of alter ego status.  The United States's argument, however, ignores the fact that several courts, including at least one in this district, have held that federal taxes are not considered to be a nationwide federal program such that Kimbell would apply.  See Wolfe v. United States, 798 F.2d 1241, 1244 n. 3 (9th Cir. 1986), amended 806 F.2d 1410, 1411 (9th Cir. 1986); Storage and Office Systems, LLC v. United States, 490 F. Supp.2d 955 (S.D. Ind. 2007); In re Homelands of DeLeon Springs, Inc., 190 B.R. 666, 670 (M.D. Fla. 1995). Moreover, the Supreme Court's decision in Aquilino v. United States, 363 U.S. 509 (1960) resolved this issue when it held that "state law controls in determining the nature of the legal interest which the taxpayer had in the property," and federal law "determines the priority of competing liens asserted against the taxpayer's 'property'."  363 U.S. at 513-14.  In this case there is no dispute over the priority over competing liens, nor is there any dispute over the validity of the United States' tax liens themselves.  The entire dispute rests on whether the United States has a lien on the Clermont property for All Seasons' tax obligations, which can only exist if Apollo is found to be the alter ego of All Seasons and, in turn, that the original note and mortgage between Apollo, Ltd. and All Seasons was invalid.  The Court agrees with Coast that such an analysis implicates the nature of Apollo's and All Seasons' legal interests in the Clermont property, and therefore state law applies.  See In re Arizona Dep't of Revenue (In re Blanton), 105 B.R. 811, 821 (W.D. Tex. 1989).  See also Drye v. United States, 5238 U.S. 49, 52 (1999) ("The Internal Revenue Code's prescriptions are most sensibly read to look to state law for delineation of the taxpayer's rights or interests, but to leave to federal law the determination whether those rights or interests constitute 'property' or 'rights to property' within the meaning of § 6321."); United States v. Craft, 535 U.S. 274 (2002) (holding same).

[14]See, e.g., Hillsborough Holdings Corp. v. Celotex Corp., 166 B.R. 461, 468 (M.D. Fla. 1994); In re Homelands of DeLeon Springs, 190 B.R. 666, 670 (M.D. Fla. 1995); Matter of Commonweal, Inc., 171 B.R. 405 (M.D. Fla. 1994); Tato Intern. Corp. v. Department of the Treasury, No. 88-0670-CIV-ATKINS, 1989 WL 104789 (S.D. Fla. July 5, 1989); In re Brickell Inv.
(continued...)

18

importantly, the vast majority of the decisions throughout the United States which address alter ego liability in the federal income tax arena have squarely applied the law of the forum state.[15]   Thus, it appears that the better weight of authority militates in favor of applying Florida law to the alter ego analysis.  And, applying Florida's three-part test to the evidence submitted in this case, it is clear that the United States has not met its very heavy burden of establishing alter ego status for Apollo.

II.   Apollo Was Not An Alter Ego of All Seasons Under Florida Law

With respect to the first prong of Florida's three-part test, domination and control, the United States has presented evidence that All Seasons, Apollo, and Apollo, Ltd. were related business entities with shared ownership and, for several years, shared office space. The Novellis and Hans Schulz at various times were shareholders and principals of each company, and Ray Novelli in particular was involved in the decisions concerning the original loan to All Seasons, each of All Seasons' bankruptcy proceedings, and Apollo's purchase of the Clermont property at the bankruptcy sale.  What the United States has not

---

[14](...continued)
Corp., 85 B.R. 164 (S.D. Fla. 1988).  See also Bendix Home Systems v. Hurston Enterprises, Inc., 566 F.2d 1039 (5th Cir. 1978).

[15]See, e.g., Aquilino, 363 U.S. at 512-13; Homelands, supra; Commonweal, supra; Tato, supra; PBV, Inc. v. Rossotti, 178 F.3d 1295, 1999 WL 220123 (6th Cir. 1999); Floyd v. United States, 151 F.3d 1295, 1298-99 (10th Cir. 1998); Wolfe v. United Sates, 798 F. 2d 1241, 1244 n. 3 (9th Cir. 1986), amended 806 F.2d 1410, 1411 (9th Cir. 1986);  In re Porras, 312 B.R. 81, 138 (W.D. Tex. 2004); United States v. Kattar, 81 F.Supp.2d 262, 275 (D. New Hampshire 1999); Today's Child Learning Center, Inc. v. United States, 40 F.Supp.2d 268, 272, n. 2 (E.D. Penn. 1998); Dean v. United States, 987 F. Supp. 1160, 1164 (W.D. Mo. 1997); In re Brickell Investment Corp., 85 B.R. at 167.  The Court has only located one unpublished decision which applied federal common law.  Tri-State Equipment v. United States, 1997 WL 375264 (E.D. Cal. April 21, 1997).

done, however, is present persuasive evidence that Apollo did not have an existence independent from All Seasons.

"The law is clear that the mere ownership of a corporation by a few shareholders, or even one shareholder, is an insufficient reason to pierce the corporate veil." Gasparini v. Pordomingo, 972 So. 2d 1053, 1055 (Fla. 3d Dist Ct. App. 2008). "[E]ven if a corporation is merely an alter ego of its dominant shareholder or shareholders, the corporate veil cannot be pierced so long as the corporation's separate identity was lawfully maintained." Lipsig v. Ramlawi, 760 So. 2d 170, 187 (Fla. 3d Dist. Ct. App. 2000). Here, the United States has presented no evidence even suggesting that Apollo's corporate identity was not lawfully maintained.

To the contrary, the undisputed evidence is that Apollo operated as a separate and distinct financing entity which raised money to lend to All Seasons so that All Seasons could operate its camping grounds. It is a legitimate corporate purpose to set up a corporation to marshal funds and lend money in debt financing for another company, and the United States has made no argument to the contrary. [16] Moreover, there is ample evidence that All Seasons engaged in sufficient "business activity" to be considered a separate taxable entity - it owned and operated camping grounds and mortgaged its property to Apollo and others in order to continue operations. See Moline Properties, Inc. v. Comm'r of Internal Revenue, 319 U.S. 436 (1943); Homelands, 190 B.R. at 671-72.

---

[16]See, e.g. Hillsborough Holdings, 166 B.R. at 473 ("It should be pointed out at the outset that the financing of a subsidiary by a parent is not improper per se.").

Indeed, the United States itself treated both Apollo and All Seasons as separate taxable entities; the IRS has assessed taxes and obtained separate and distinct liens against both businesses.[17]

Other than common identity of some of the shareholders, the United States has not shown that any one shareholder - presumably Ray Novelli - completely controlled and dominated Apollo and All Seasons such that their separate corporate identities evaporated. Rather, the evidence shows that while Mr. Novelli may have had some involvement in various business decisions, there were always other individuals involved.[18]  Moreover, the United States has not presented any evidence sufficient to challenge the existence and/or validity of Apollo, Ltd.'s loan to All Seasons in 1986.  Rather, the sole witness proffered by the United States, Ray Novelli, testified that the loan was conducted at arms-length, signed by the President of All Seasons, and that at least some payments were made on the loan. The United States has not done anything to refute these facts, other than to emphasize that some of the shareholders owned both companies.  This is simply not enough.

Even if the Court were to assume that the United States had established that Apollo and All Seasons were one and the same, the Court concludes that the United States has

---

[17]In addition, Counsel for the United States stated at the bench trial that "we're certainly not arguing that any of these corporations is a sham, Judge."  See Transcript from December 14, 2006 Bench Trial, p. 97.  (Doc. 165).

[18]For example, the United States makes much of the fact that Ray Novelli hired Phillip Martinez as President of Apollo, Ltd., upon his release from prison.  This fact, in and of itself, does not establish that Martinez was acting at the direction of Mr. Novelli, or that Mr. Novelli controlled the decisions of Apollo, Ltd. during All Seasons' 1997 bankruptcy.

not met its burden on the last two factors:  that Apollo Inc.'s corporate form was used for a fraudulent or improper purpose which caused harm to any creditors.  To support this portion of its argument, the United States makes four contentions: (1) that the original loan from Apollo, Ltd. to All Seasons in 1986 was either not valid to begin with or did not survive All Seasons' first two bankruptcies; (2) that Apollo was acting under the direction of Novelli at the time of the October 1997 bankruptcy auction, and that Novelli deliberately set out to obtain the Clermont property to avoid paying All Seasons' creditors; (3) that by waiting until the day of the auction to file its secured claim, Apollo, Ltd., acting in concert with All Seasons, fraudulently obtained the Clermont property to the detriment of All Seasons' other creditors; and (4) that after Apollo acquired the Clermont property, it subsequently leased the property to the newly-formed Travel America company, and ultimately to the newly-formed Orlando All Seasons corporation.[19]

With respect to the first contention, the Court concludes that the 1986 loan from Apollo, Ltd. to All Seasons was valid, secured by a properly executed note and mortgage, and existed and remained enforceable at the time of the October 1997 bankruptcy auction. The promissory note and mortgage memorializing and securing the 1986 loan have been submitted as part of the record in this case; and the Court finds that their existence is *prima facie* evidence of the debt itself.  See Perez v. Rivero, 534 So. 2d 914 (Fla. 3d Dist. Ct.

---

[19]The United States does not differentiate between Apollo, Ltd. and Apollo for purposes of alter ego status.  Rather, the United States urges the Court to consider both entities to be one and the same.

App. 1988).   In addition, Ray Novelli, the only witness proffered by the United States, testified as to the existence of the note and mortgage, that All Seasons made some payments on the note, and that Apollo, Ltd. filed claims in both of All Seasons' prior bankruptcies.[20]  The United States has not put forth any admissible, persuasive evidence demonstrating that the 1986 note and mortgage were either a sham or did not exist at the time of the 1997 bankruptcy auction.[21]    Accordingly, the United States has not met its burden as to its first contention.

The Court also finds that the United States has failed to meet its burden as to its second contention - that Ray Novelli directed Apollo, Ltd. to obtain the Clermont property at auction to defraud creditors.  Assuming arguendo that the United States has established that Mr. Novelli directed Apollo, Ltd. to file its secured claim in the third All Seasons' bankruptcy and to bid on the Clermont property, the United States' cannot overcome one insurmountable and basic hurdle.  The undisputed evidence shows that Apollo obtained

_____

[20]During the bench trial, the United States frequently cast aspersions on the credibility of Mr. Novelli while, at the same time, urging the Court to accept as fact portions of his deposition testimony.  The Court finds this course of action unavailing - either Mr. Novelli's testimony is to be accepted or it is not.  The Court concludes that it should be accepted - there is no evidence suggesting that Mr. Novelli was dishonest in his testimony - at the time of his deposition the Clermont property had been sold at auction under the direction of this Court, and it was known fact that Mr. Novelli (and/or any of his related corporate entities) would never receive any of the sale proceeds.  Therefore, Mr. Novelli had no reason to misrepresent the facts surrounding the acquisition and disposition of the Clermont property.

[21]Other than calling into question Ray Novelli's veracity, the only other evidence submitted by the United States consists of the web pages from All Seasons' prior two bankruptcies.  The Court has already found that these documents are not sufficient to establish the existence or non-existence of Apollo, Ltd.'s secured claim, and therefore will not be further considered.

the Clermont property in 1997 through a public Chapter 11 bankruptcy auction, conducted

by an independent Trustee after a thorough investigation into All Seasons' financial status,

before all of All Seasons' creditors - including the United States - with the sale ultimately

being approved by the bankruptcy court.  There is simply no basis for holding that a public

sale, approved by a federal court, and which has never been contested until this case, can

constitute a fraud - and the United States has not presented any legal authority to suggest

otherwise.

In order for the Court to adopt the United States' position, the Court would have to

conclude that, rather than acting in the best interests of the creditors, the Trustee was

acting in concert with Apollo and All Seasons to commit a fraud on the creditors.  Not only

is there no evidence to support such a conclusion, but the United States itself admits that

the Trustee acted appropriately.  Given that Apollo obtained the Clermont property out in

the open, as part of a public and court-supervised proceeding, and in front of the United

States and other creditors, the Court cannot find that the United States has met its burden

on this point.

The United States' third contention is closely related to the second and focuses

solely on the fact that Apollo, Ltd. filed its claim in All Seasons' bankruptcy on the day of

the auction.  This fact, in of itself, does not demonstrate any nefarious actions on the part

of Apollo, Ltd.  The United States has not provided any evidence or presented any legal

authority to suggest that Apollo, Ltd.'s claim was untimely, or that filing a claim on the day

of the auction was prohibited.  Moreover, as the United States points out, the address on

Apollo Ltd.'s secured claim is the same address as on All Seasons' bankruptcy petition. Thus if the Trustee had any suspicion of any fraudulent activity, the fact that the parties shared the same address should have either raised or fueled those suspicions.  The fact that the Trustee, who had conducted a very thorough, months long investigation prior to the auction, did not see anything wrong with the sale of the Clermont property to Apollo, Ltd., coupled with the fact that the United States has nowhere suggested any deficiencies in the Trustee's performance, is very persuasive.  The United States has not met its burden on its third contention.

The United States fourth and final contention focuses on events which took place after the conclusion of the bankruptcy auction, and after the bankruptcy court approved the sale of the Clermont property to Apollo, Ltd.  According to the United States, Apollo's lease agreements with two separate entities - neither of which existed at the time of the bankruptcy auction - constitute a fraud upon All Seasons' creditors.  This barebones argument rests on the necessary conclusion that Apollo's acquisition of the Clermont property in October 1997 was itself fraudulent - a conclusion which the Court has already rejected.  If Apollo obtained the Clermont property at auction free and clear and without the taint of any fraudulent or improper purpose, it follows that Apollo was then free to do whatever it wanted with the property post-auction, including entering into leases with later-formed companies.  The United States has not presented any evidence or legal authority

showing how Apollo's post-auction actions could retroactively render its purchase of the Clermont property fraudulent.[22]

In sum, the Court concludes that the United States has not met its very heavy burden under Florida law of demonstrating that Apollo's acquisition of the Clermont property in October 1997 was done with a fraudulent or improper purpose and, therefore, the United States has not established that Apollo was the alter ego of All Seasons.  See Hillsborough Holdings, 166 B.R. at 468-69.

III.   Successor Liability

The United States has also argued that its tax liens against All Seasons should be imputed to Apollo through a theory of successor, or "mere continuation" liability.  According to the United States, when Apollo, Ltd. purchased the Clermont property in October 1997, it was acting as a mere continuation of All Seasons.  See Howard Johnson Co. v. Detroit Local Joint Executive Bd., 417 U.S. 249, 259, n. 5 (1974).  To support this argument, the United States points to the following facts: (1) All Seasons, Apollo, Ltd., and Apollo shared the same business address and had some similarity of ownership; (2) at the time of Apollo's acquisition of the Clermont property Apollo knew of All Seasons' substantial tax debts and that All Seasons would not be able to pay them; and (3) the Clermont property continued to operate as a private campground facility until its foreclosure sale.

_____

[22]The United States also has not established that these newer corporations, which undisputedly were created years after All Seasons was dissolved, constitute the alter egos of All Seasons.

Generally, Florida law does not impose the liabilities of a predecessor corporation on a successor corporation unless:  (1) the successor expressly or impliedly assumes obligations of the predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid the liabilities of the predecessor.  Laboratory Corp. of America v. Professional Recovery Network, 813 So. 2d 266, 269 (Fla. 5th Dist. Ct. App. 2002); Bernard v. Kee Mfg. Co., Inc., 409 So. 2d 1047, 1049 (Fla. 1982).  As already discussed at length, none of these facts exist in this case.  There is no evidence that Apollo expressly or impliedly assumed the obligations of All Seasons, that the sale of the Clermont property at the bankruptcy auction was a de facto merger of Apollo and All Season, or that the auction purchase of the Clermont property was a fraudulent effort to avoid the liabilities of All Seasons.

There is also insufficient evidence to establish that Apollo was merely a continuation or reincarnation of All Seasons, primarily for the simple fact that Apollo was created in 1986 for the purpose of obtaining financing and was never dissolved; therefore there was no new corporation created to continue All Seasons' business operations.  The fact that Apollo and All Seasons shared the same business address for approximately ten years does not equate to successor liability.  See Laboratory Corp., 813 So. 2d at 270 ("having common attributes does not automatically impose liability on a successor corporation").  Cf. In re F & C Services, Inc., 44 B.R. 863, 868 (S. D. Fla. 1984) (corporate form may be disregarded "where principals of a debtor attempt to transfer corporate assets to a newly created

corporate entity, which they also control, [and] when the new corporation is a mere continuation of the debtor, controlled by the same persons, and made up essentially of the same assets and resources as the old corporation").  Moreover, just as with the traditional alter ego analysis, the United States' failure to establish that the acquisition of the Clermont property through a court-approved bankruptcy auction was fraudulent similarly dooms its "mere continuation" theory.  See Redman v. Cobb Intern., Inc., 23 F. Supp. 2d 1372, 1376 (M.D. Fla. 1998) (rejecting mere continuation theory of successor liability in part because underlying asset sales were "mesne transactions" and not a fraudulent effort to avoid the predecessor's liabilities).  In this case, where it is clear that Apollo ultimately obtained the Clermont property in satisfaction of an executed and valid debt - *i.e.* for consideration - the Court cannot conclude that Apollo was a "mere continuation" of All Seasons.  See, e.g., Amjad Munim, M.D., P.A. v. Azar, 648 So. 2d 145 (Fla. 4th Dist. Ct. App. 1994) (finding "mere continuation" theory applied where assets were transferred overnight without any consideration).

IV.   Fraudulent Transfer Analysis

       The United States' inability to demonstrate any fraud on the part of Apollo also undermines its fraudulent transfer analysis.  Under Florida law:[23]

       (1)    A transfer made . . . by a debtor is fraudulent as to a creditor, whether
       the creditor's claim arose before or after the transfer was made . . ., if the
       debtor made the transfer . . . :

_____

       [23]The Parties agree that Florida law governs this portion of the United States' argument.

(a)     With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b)     Without receiving a reasonably equivalent value in exchange for the transfer . . ., and the debtor:

1.     Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2.     Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they become due.

Fla. Stat. § 726.105.

In addition, where a creditor's claim arose before the transfer, the transfer is also considered fraudulent under Florida law if (1) "the debtor made the transfer. . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer. . .;' or (2) "the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent." Fla. Stat. § 726.106.  An "insider" is defined as including a corporation where 20 percent or more of its voting securities are directly or indirectly owned, controlled, or held, by the debtor or a person who owns, controls or holds 20 percent or more of the voting securities of the debtor.  Fla. Stat § 726.102(1)(b).

The United States contends that Apollo's acquisition of the Clermont property in October, 1997 was fraudulent for several reasons.[24]  First, that All Seasons caused the transfer of the property to Apollo with the actual intent to hinder, delay or defeat the United States and its other creditors from collecting on their debts.[25]  One of the many problems with this argument is that the transfer occurred as part of a bankruptcy auction, operated by an independent bankruptcy trustee after concluding a detailed months-long investigation into All Seasons' finances, and approved by the bankruptcy court after conducting a hearing where the creditors (including the United States) were present.  Thus, the only way for the United States' argument to work would be to establish that the bankruptcy trustee, the bankruptcy court, and each creditor were all duped by All Seasons and Apollo.  And

_____

[24]In its post-trial brief, the United States first appears to argue that the transfer at issue is the December 24, 1999 Quit Claim Deed which clarified that Apollo was the owner of the Clermont property.  See Doc. 168, p. 26.  However, in the very next paragraph, the United States urges that "this Court should disregard any formal distinction between the partnership and the corporation, and find that the transfer from [All Season's] bankruptcy estate was effectively a transfer directly to [Apollo] the corporation."  Id.  The United States then spends the remainder of its brief arguing from the premise that Apollo's acquisition of the Clermont property in October 1997 was fraudulent.  It is therefore clear that the United States has abandoned any fraudulent transfer argument with respect to the Quit Claim Deed, and the Court will limit its analysis to the October 1997 bankruptcy auction transaction.

[25]In determining "actual intent," courts may consider, among other factors, whether:  (1) the transfer was to an insider; (2) the debtor retained possession or control over the transferred property after the transfer; (3) the transfer was disclosed or concealed; (4) the debtor had been sued or threatened with suit before the transfer was made; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.  Fla. Stat. § 726.105(2)(a)-(k).

while the United States apparently seeks to make such an argument based on mere speculation, see Doc. 168, p. 30, n. 26, the minimal evidence it has presented to the Court does not support such a result.

Moreover, as counsel for the United States admitted, it is the duty of the bankruptcy trustee to ensure that the liquidation of any of the debtor's assets is done in such a way as to benefit all creditors.[26]   The United States does not suggest, much less provide any evidence, showing that the trustee did not fully execute his duties in this respect.[27]   There is also a complete absence of any evidence to support the United States' theory that the trustee was blind sided by Apollo's filing of its secured claim on the date of the auction. The Court concludes that this portion of the United States' fraudulent transfer theory fails.

The United States next argues that a fraudulent transfer occurred because All Seasons did not owe a valid antecedent debt to Apollo at the time of the transfer, and as a result, All Seasons did not receive a reasonably equivalent value in exchange for the Clermont property.   See Fla. Stat. § 726.106(1).   The United States's position is that Apollo never transferred any funds to All Seasons and the alleged debt which All Seasons satisfied by giving Apollo the Clermont property never existed.   Stated differently, the United States is again challenging the validity of the original $1,000,000 note and mortgage

---

[26]See December 14, 2006 Transcript from Bench Trial, pp. 101-02.  See also United States' Post-Trial Brief, p. 30 ("Only when a trustee's efforts will produce some benefit to the estate (*i.e.,* its unsecured creditors) is it appropriate for the trustee to incur expenses and fees to sell property.") (Doc. 168).

[27]See, e.g., Doc. 168, p. 30, n. 26 ("This is not to suggest that the Trustee was a party to fraud.").

—

between All Seasons and Apollo, Ltd.  The Court has already found this argument to be without merit - all evidence before the Court demonstrates that the note and mortgage did exist, that they were properly executed, and that they remained valid and enforceable until All Seasons' third and final bankruptcy.

Lastly, the United States argues that even if All Seasons did owe Apollo a valid antecedent debt, the transfer of the Clermont property to Apollo was a transfer to an insider at a time when All Seasons was insolvent, and when Apollo clearly knew or had reason to know of the insolvency, thereby rendering the transfer fraudulent under Fla. Stat. § 726.106(2).  At the time of the transfer, Ray Novelli owned at least 20 percent of both All Seasons and Apollo, which would make Apollo an insider under Fla. Stat. § 726.102(1)(b).

At first blush this argument is somewhat attractive - there is no dispute that Apollo and All Seasons were affiliated entities with common ownership at various points in time. However, as Coast correctly points out, upon closer inspection the argument fails because Florida's Fraudulent Transfer Act specifically excludes assets "to the extent [they are] encumbered by a valid lien."  Fla. Stat. § 726.102(2)(a).  Thus, if All Seasons did owe Apollo a valid antecedent debt - *i.e.* the note and mortgage were valid - then the Clermont property was properly encumbered by this debt, Apollo had a proper secured claim, and the transfer to Apollo as part of the 1997 bankruptcy proceedings cannot be considered fraudulent.

It is quite common for bankruptcy trustees to permit sales at auction of property to insiders of the debtor, and the United States has not provided any evidence or legal

authority suggesting that such an event, when conducted in the face of a valid lien, can be considered fraudulent.  To do so would result in a state law negating sales at  auctions conducted and approved by federal bankruptcy courts.  This cannot be the proper result.[28]

As such, the United States' third fraudulent transfer argument also fails.[29]

III.    Motion for Partial Reconsideration

The United States has also filed a motion for partial reconsideration in which, for the first time, it requests that the Court distribute the remaining sale proceeds pursuant to Section 726 of the Bankruptcy Code.  (Doc. 153).  In so asking, the United States raises virtually the exact same arguments it put forth in its original motion requesting that the sale proceeds be returned to the Bankruptcy Trustee, arguments which the Court has previously rejected.  The United States's motion raises no new issues of law or fact, and does not point out any clear errors or manifest injustices rendered by virtue of the Court's prior Order.  As such, the United States of America's Motion for Partial Reconsideration (of 9/25/06 Order), to Have this Court Distribute Sale Proceeds According to Bankruptcy Law, (Doc. 153), is DENIED.[30]

---

[28]There is no apparent decision in which a court declared a transfer to be fraudulent where the transfer took place under the direction of a trustee as part of an ongoing bankruptcy proceeding.

[29]The Court finds that the exclusion of property encumbered by valid liens from Florida's Fraudulent Transfer Act equally applies as an alternative basis for rejecting the United States' other arguments that Apollo's acquisition of the Clermont property was a fraudulent transfer.

[30]The Court similarly will not consider Coast's waiver argument.  The Court previously discussed and rejected Coast's theory of waiver in its order denying summary judgment, and
(continued...)

## **CONCLUSION**

Having determined that the United States has failed to meet its burden to establish that Apollo is the alter ego of All Seasons, or that Apollo should be held liable for All Seasons' tax liabilities under a "mere continuation" theory, or that Apollo's acquisition of the Clermont property was a fraudulent transfer, the Court finds that the United States's right to distribution of the remaining sale proceeds is limited to its tax liens against Apollo directly, and that the United States is not entitled to collect from the fund any of its tax liens against All Seasons.

With respect to the tax liens against Apollo, the Parties do not dispute, and the Court therefore concludes as a matter of law, that the federal tax liens which arose with the unpaid tax assessments against Apollo as described in paragraphs 4 and 5 of the United States' Supplemented Complaint in Intervention (Doc. 126) have attached to the Clermont property and to the net proceeds of the sale of the Clermont property.  The Court further concludes, based on the agreement of all Parties, that these tax liens against Apollo have priority over the judgment lien of Coast.

The Court therefore will first use the remaining proceeds in the Court's registry to satisfy the tax liens against Apollo with the balance going to Coast.  Although the United States has repeatedly stated that the tax liens against Apollo are "approximately $25,000,"

---

[30](...continued)
Coast has not presented any new evidence to suggest that the Court should revisit its decision. Moreover, given the Court's findings on the issues of alter ego and fraudulent transfer, the Court concludes that it is not necessary or appropriate to further discuss Coast's waiver defense.

the record before the Court does not reflect the precise amount due.  Nor does the record reflect the manner in which either Party wishes to have the proceeds in the Court's registry distributed (*i.e.,* the address for delivery of payment, the name of the payee, and/or the agent who will accept payment).  Accordingly, within ten (10) days of the date of this Opinion, the Parties are directed to file notices with the Court providing information concerning the manner in which the proceeds should be distributed.  Within this same time period the United States shall submit its proofs as to the precise amount of the tax liens against Apollo

The United States of America's Motion for Partial Reconsideration (of 9/25/06 Order), to Have this Court Distribute Sale Proceeds According to Bankruptcy Law, (Doc. 153), is DENIED.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 30th day of July, 2008.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record